UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

DOUGLAS K. MISENER,               )
                                  )
          Plaintiff,              )
                                  )
     v.                           )     CAUSE NO. 1:12-CV-36 JD
                                  )
MICHAEL J. ASTRUE, Commissioner of )
Social Security,                  )
                                  )
          Defendant.              )

## OPINION & ORDER

On October 1, 2008, Claimant Douglas Misener applied for Social Security Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI),[1] [DE 1 ¶ 6], alleging a

disability onset date of June 27, 2006. He claimed he was disabled due to symptoms associated with

bi-polar disorder; attention deficit disorder; attention deficit hyperactivity disorder; depression;

bilateral degenerative joint disease; chronic axial pain; osteoarthritis; and lupus. [R 79]. On February

17, 2009, Misener's initial applications were denied [R 76], and on May 6, 2009, his request for

reconsideration was denied. [R 91]. On July 1, 2009, Misener requested a hearing before an

Administrative Law Judge ("ALJ"). [R101].

The hearing was held on June 24, 2010. Misener appeared with counsel and testified on his

own behalf before an ALJ presiding remotely from Chicago. [R 111-12]. An impartial Vocational

Expert ("VE") also appeared at the hearing. [R 66]. On October 7, 2010, the ALJ found that Misener

---

[1] The regulations governing the determination of disability for Disability Insurance Benefits are found at 20 C.F.R. § 401.1501 *et. seq.*, while the Social Security Income regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

was not disabled under the Social Security Act, concluding that he had the residual functional capacity ("RFC")[2] to perform jobs that exist in significant numbers in the national economy. [R 24]. On December 7, 2011, the Appeals Council denied Plaintiff's request for a review of the ALJ's decision, at which point the ALJ's decision became the final decision of the Commissioner. [R 1].

On February 3, 2012, Misener filed his Complaint in this Court pursuant to 42 U.S.C. § 405(g), alleging that the ALJ's decision was in error. [DE 1]. On July 2, 2012, Misener filed his opening brief. [DE 16]. On October 1, 2012, the Commissioner filed his response. [DE 23]. On October 15, 2012, Misener filed his reply. [DE 24]. Although most of the arguments Misener has advanced are actually meritless, this Court finds that a remand is necessary because the ALJ found that Misener suffers from moderate limitations on concentration, persistence and pace, but failed to incorporate that limitation into his RFC or into his hypothetical questions to the VE.

## BACKGROUND[3]

Douglas Misener was born on May 16, 1971. He was 35 years old on the alleged date of onset of his disability, and he is 41 years old currently. [R 166]. Misener was 6'2" and weighed 255 pounds at the time of his applications. He attended school through the seventh grade, which he completed in 1985. [R 38, 170, 176]. Misener's past employment includes positions as a stocker/cashier, concrete specialist, and cook. [R 172]. He has not performed substantial gainful activity ("SGA") since his alleged onset date of June 27, 2006, and he was insured for the purposes

---

[2] Residual Functional Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R § 404.1545(a)(1).

[3] This section is a simple summary of the facts of the case; it is not meant to be exhaustive, particularly where the record spans over 700 pages. Material facts and medical evidence are explored in more detail during the court's discussion of the issues.

of DIB through at least December 31, 2011. [R 161-62]. For some time, Misener has suffered from chronic pain, related to various medical problems. His medical history, as reproduced in the record, begins in earnest in 2005. It is useful to view his physical and mental ailments and progressions separately.

## A.      Physical Health History

On November 1, 2005, Misener scheduled an appointment with Dr. David W. Spight, D.O., due to neck pain, headaches, bilateral knee pain, and paresthesias involving the toes of both feet. [R 315]. He claimed that a five year-old work-related injury had led to a series of surgeries and related procedures: left knee surgery for repair of a possible left knee dislocation; two arthroscopes to the left knee and one arthroscope to the right knee; physical therapy on both knees, and "failed Cortisone and Synvisc injections in both knees." [R 315]. He also reported a history of unsuccessful medication relative to his migraine headaches; prior treatment of the headaches with Stadol left him "wasted" afterwards, and Aleve, Excedrin Migraine, Tylenol Migraine, Imitrex, Relpax, Darvocet, Norco, Topamax, Keppra and Stradol had all failed due to side effects or inefficacy. [R 316].

From that date until roughly March of 2007, Misener saw medical professionals approximately once a month for consultations and treatment related to the same ailments. The doctors attempted to treat and control Misener's various sources of pain with a series of medications, and with varying degrees of success. Early in the process, some medications had extremely unpleasant side effects, including one episode in which Misener reported to the Emergency Room with nausea, vomiting, sweating, and shaking. [R 253 (Jan. 16, 2006 visit)]. By the end of this approximately 1.5 year period of treatment, however, physicians' notes showed that medication was generally providing "fair" to "good" pain control and having no side effects. [R 270; R 275; R 277].

3

More detail about Misener's medical history during this time period is included in the court's discussion where relevant.

In any case, the relative stabilization of Misener's symptoms in 2007 did not mean an end to his troubles. His pain continued, and on January 22, 2009, Misener began a long-standing relationship with the Center for Pain Relief when he made an appointment with Dr. William Hedrick to discuss his ongoing bilateral knee pain. Misener described the pain as constant, stabbing and burning, worse on the left than on the right, aggravated by walking, weather changes, and stairs, and rated at a 7/10 in severity at the time, but 9/10 at its worst. [R 395]. Misener also reported pain in the lumbar region that radiated across the back and extended down to the toes and described as constant, throbbing, burning, and numb, and rated it at 6/10 in severity at the time and 8/10 at its worst. *Id.* Bending, lifting, twisting, pushing, pulling, crawling, stooping, walking, weather changes, and stairs aggravated the lumbar pain. *Id.* He also noted numbness in his toes. *Id.* So, in many respects, the symptoms of which Misener complained were the same ones he was treated for from November of 2005 through March of 2007, but during this phase of treatment the records contain more detail. Dr. Hedrick's physical exam found sacroiliac joint tenderness bilaterally, myofascial and knee tenderness, a positive straight leg raise test, lumbar facet tenderness, decreased knee range of motion, and positive Lachman's test, McMurray's test, and Patrick's sign. [R 396]. The impressions were left knee arthralgia, chronic pain syndrome, diabetes mellitus, bilateral sacroilitis, and bilateral lumbar facet arthropathy. *Id.*

By this time, Misener was also attempting to secure benefits from the Social Security Administration. As a part of that process, on January 31, 2009, Misener underwent a consultative exam conducted by Dr. Rowena C. Yu, M.D. [R 413]. The diagnoses were bilateral knee pain status-

4

post multiple surgeries, lower back pain, a bipolar disorder, left ankle pain status-post multiple surgeries, left elbow and wrist pain status-post surgery, osteoarthritis, probable systemic lupus erythematosus, diabetes mellitus Type II, and hypertension. [R 416-17]. Specifically, Misener was noted as getting on and off the exam table with moderate difficulty, having a normal ambulation, "severe limitation of movement in all directions" in the cervical spine, lumbar spine, bilateral hips, and bilateral knees, being able to lay straight back on an exam table and roll to one side only with moderate difficulty, being unable to walk on heels or walk heel-to-toe, being able to walk or lift toes with severe difficulty, and being able to squat only 20% of the way. [R 415-16]. Misener told Dr. Yu that he could stand for a total of 2 hours, sit for one hour, and lift 15 pounds. [R 414]. Misener also noted he could not sweep, mop, vacuum, or mow the grass. *Id*.

On February 12, 2009, non-examining state-agency reviewer Dr. F. Lavallo, M.D., completed a physical RFC assessment. He indicated, generally speaking, that Misener was capable of light work with occasional posturals. [R 418-25]. Dr. Lavallo's specialization is occupational medicine and he acknowledged that there were no treating or examining source statements in the file when he reviewed it. [R 424-25]. Dr. Richard Wenzler, M.D., affirmed Dr. Lavallo's assessment on May 6, 2009. [R 449].

Misener continued to seek treatment. On May 15, 2009, Misener was treated for bilateral knee pain rated at 7/10 in severity and lumbar back pain rated at 6/10. [R 550]. The physical exam found sacroiliac joint tenderness bilaterally, myofascial tenderness, a positive Patrick's sign, lumbar facet tenderness, and face loading. [R 551]. On May 22, 2009, Dr. Hedrick administered lumbar and sacroiliac joint steroid injections, and a caudal epidural steroid injection to Misener. [R 548]. A May 28, 2009, lumbar spine MRI revealed degenerative changes, widened L4-L5 facets, and

levoscoliosis. [R 466]. Subsequently, on June 8 and 10, 2009, Misener rated his bilateral knee pain to be 7/10 and his lumbar back pain to be at a level of 6/10. [R 542, 545]. The physical exam found the same results as before. [R 543, 547]. On July 29, 2009, Plaintiff was treated by Dr. Anuradha Kollipara for diabetes, chest pains, tightness in his legs, numbness in his feet, shortness of breath, and the feeling that his head was "going to explode." [R 478]. This began a period in which Misener was treated by both Drs. Kollipara and Hedrick.

Misener saw Dr. Kollipara five times, in total, all in the latter part of 2009. On February 5, 2010, Dr. Kollipara completed an RFC assessment, finding that Misener could *never* lift or carry anything – not even up to 10 pounds – could only sit for 15 minutes total in an 8-hour workday, stand for 15 minutes total in an 8-hour workday, and walk for 5 minutes total in an 8-hour workday; could only occasionally reach, handle, finger, feel, push or pull with either hand; could *never* operate foot controls with either foot; and could *never* climb stairs or ramps, climb ladders or scaffolds, balance, stoop or kneel. [R 732-38]. He could occasionally crawl, however. Dr. Kollipara's RFC assessment is an integral part of Misener's argument in this case.

Misener continued to seek treatment from Dr. Hedrick and his associates at the Center for Pain Relief until approximately March of 2010. His treatment followed the same general course and was related to the same general symptoms. Typically, he received one or more injections to treat his pain, and the effectiveness of the injections varied. They were more effective at first, alleviating up to 50% of his pain for a reasonably long time, but quickly became less effective. For example, on September 11, 2009, Dr. Chad Stephens, D.O., issued a letter noting that the facet injections worked initially, but that the second injection lasted only 3 days and the third injection did not work at all. [R 463]. In the course of his treatment at the Center for Pain Relief, Misener was prescribed a cane,

which he does use regularly to ambulate, and his doctors suggested a wheelchair, which he does not use regularly. [R 577].

**B.    Mental Health History**

Misener suffered from mental impairments in addition to his physical ailments, over roughly the same span of time. The first concrete medical record is a March 15, 2006, progress note from Psychiatric Services, P.C., ("PSP") providing diagnoses of depression and anxiety, and recording a Global Assessment of Functioning ("GAF") score of 60. [R 365]. Some time later, on August 10, 2007, Misener was admitted to the emergency room at Parkview General Hospital, reporting increased anxiety, panic attacks, feeling like he was "breaking down," that he was "fearful of leaving his house – fears having a panic attack," and that he had an outburst of crying a few days ago." [R 331]. Misener complained that "[t]his anxiety is screwing up my life . . . I want to feel normal – I want these panic attacks to stop." [*Id.*]. Furthermore, it was noted that Misener suffered from sexual abuse at the hands of two uncles at age 6, and at the hands of his adoptive mother from ages 10 to 11. He also suffered physical and emotional abuse by his stepfather. [R 332]. The mental status exam found Misener's insight and judgment to be normal, his behavior to be restless and tearful, and his mood to be depressed and anxious accompanied by thoughts of helplessness and pressured speech. [R 333]. The diagnoses by attending Dr. Mahendar Surakanti were a panic disorder and generalized anxiety disorder, and Dr. Surakanti recorded a GAF score of 50. [R. 334].

On the same day, Misener returned to PSP for treatment of his severe anxiety and depression. It was noted that he exhibited a depressed mood, insomnia, changes in his appetite, interest and activities, and energy level, concentration problems, feelings of hopelessness, panic attacks with shortness of breaths, dizziness, palpitations, trembling, sweating, choking, nausea, numbness,

depersonalization, a fear of dying, a fear of going crazy, and a fear of being in places or situations. [R 360-61]. The mental exam found an anxious affect. [R 364]. Shortly thereafter, Misener received treatment from PSP on August 13, 2007, and August 15, 2007, during which sessions he recorded a GAF score of 60. [R 358-59]. But on August 20, 2007, Misener's GAF score had decreased to 40. [R 357]. In his next PSP visit on September 7, 2007, Plaintiff had increased anxiety and still showed a GAF score of 40. [R 356]. Misener continued to seek treatment for his depression and GAF scores ranging from 40 to 60 at PSP in 2007, 2008, and 2009. [R 343-55].

On January 28, 2009, Misener underwent a mental status consultative exam conducted by Dr. Wayne J. Von Bargen, Ph.D. [R 408]. The psychologist's diagnoses were a bipolar disorder and a post-traumatic stress disorder. He likely ruled out an anxiety disorder and an attention-deficit hyperactivity disorder, and recorded a GAF score of 45. [R 410]. The psychologist acknowledged Misener's "history and current presentation indicate the presence of affective instability, with significant depressive episodes, and probable episodes of mania," a likely "posttraumatic stress disorder . . . manifested by anxiety, nightmares, and intrusive thoughts of past abuse," and that an "additional diagnosis of anxiety disorder may be warranted, but there is significant symptom overlap among these conditions." [R 409]. Dr. Von Bargen also noted that it was possible Misener had an "attention deficit hyperactivity disorder, manifested by poor concentration, inattentiveness, and restless." However, he also noted that there was significant symptom overlap with his bipolar disorder, which may account for these symptoms [R 410]. He stated that Misener "apparently [] accomplishes little on a typical day, remaining generally isolated and unproductive." [*Id.*]

On February 17, 2009, Dr. Maura Clark, Ph.D. completed a psychiatric review, finding Misener had an affective disorder (bipolar disorder and depression) and an anxiety-related disorder

(post-traumatic stress disorder) that caused moderate limits in maintaining social functioning and concentration, persistence, and pace and mild limits in activities of daily living. [R 426-36]. Dr. Clark also concluded that Misener's ability to remember work-like procedures, understand and remember very short and simple instructions, and understand and remember detailed instructions was not significantly limited. [R 440]. Dr. Clark further concluded that Misener was not significantly limited in several categories: his ability to carry out very short and simple instructions; ability to carry out detailed instructions; his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; his ability to sustain an ordinary routine without special supervision; his ability to work in coordination with or proximity to others without being distracted by them; his ability to make simple work-related decisions; his ability to accept instructions and respond appropriately to criticism from supervisors; his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; his ability to respond appropriately to changes in the work setting; and his ability to set realistic goals or make plans independently of others. [R 440-41]. She concluded that Misener was only moderately limited in a few categories: his ability to interact appropriately with the general public; his ability to work a complete and normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and his ability to maintain attention and concentration for extended periods. [*Id.*]. Dr. Kenneth Neville, Ph.D, affirmed this assessment on May 1, 2009, [R 448].

Misener continued with his treatments for his bipolar disorder at PSP in early 2009. [R 451-54]. Misener's GAF score fell to 40-50 on March 11th when he was noted as "not doing well." [R 452].On the same day, Dr. Mahender Surakanti, M.D., of PSP, issued a letter noting that he had been

treating Misener for bipolar disorder since 2004 and that Misener, in his opinion, was "presently unable to work full time or part time." [R 444]. Misener then continued to receive treatment at PSP in mid-to-late 2009 and early 2010, and during which he received GAF scores ranging from 40 to 60. [R 578-84]. However, for the majority of the time Misener's GAF remained steady at 60. [*Id.*]. On April 29, 2010, Misener underwent an initial evaluation at Psychological Service Associates, Inc. ("PSA"), where he was assessed with a post-traumatic stress disorder, depressive disorder, and a GAF score of 45, currently, and 50, as the highest in the past year. [R 725]. Specifically, Misener was noted as "experiencing angry outbursts, anxiety and worry, avoidance of situations which elicit memories of trauma, brooding over the past, complaints of pain in back, knees, depressed mood, difficulty with intimate relationships, feelings of detachment from others, generalized anxiety, social withdrawal and suppressions of feelings and thoughts related to trauma." [*Id.*] Soon thereafter, Misener returned to PSA. On May 3, 2010, he exhibited a depressed, apprehensive, and irritable mood, a suppressed affect and a GAF score of 45. [R 726]. On May 10, 2010, he reported anxiety, feelings of not feeling safe, and an apprehensive mood, intense affect, and a GAF score of 45. [R 727].

## C.    Administrative Hearing and ALJ Decision

At the administrative hearing, Misener testified that he lived with his wife and two children, ages two and nine. [R 37-38]. He stated that he was unable to work because of: (1) his migraines; (2) a right rotator cuff that prevented him from raising his right arm above his head; (3) left lumbar scoliosis with spinal knot; (4) severe arthritis in his knees, including no cartilage in one knee; (6) chronic pain throughout his body; and (7) uncontrolled diabetes. [R 41-43, 49]. He described the chronic pain as constant, stabbing, and burning, and running from the base of his neck down to the

back of his knees. [R 58-59]. Misener also noted that the pain severity changed from day to day, but rated on average between a 7 and 8 out of 10 (with medication), and that it would be aggravated by physical activity. [R 59, 66]. Misener further testified that he suffered from migraines two to three times weekly that lasted from two to three hours to all day long, with associated vomiting and avoidance of light and sound. [R 62-63].

Misener also testified that he suffers from nausea, sleepiness, shakes, and numbness as side effects from the medications he is currently taking. [R 49]. Misener stated that he had trouble sleeping at night due to his back and knee pain and blood pressure medication. [R 52-53]. Misener also testified that he could sit for a total of an hour and 15 minutes over an 8-hour period, lift at most a gallon of milk (~8.6 pounds), and walk and stand an hour each over an 8-hour period while using a cane. [R 43, 60-61]. Furthermore, he had a cane at the hearing, which he testified that he needed for walking and that he used a wheelchair about two to three times a week when grocery shopping. [R 60, 63]. He also noted that he had no insurance and could not afford a wheelchair when it was first suggested by his physicians. [R 64]. Misener noted that he could dress himself except for his shoes, could microwave food, and could accompany his wife shopping for groceries. On the other hand, he could rarely do dishes, and didn't do laundry or sweep. [R 53-54]. Misener also testified that although he did have a license with no restrictions, he did not drive. That said, it would not be a problem for him to operate a vehicle, deteriorating vision aside. [R 61-62]. Misener then testified regarding his bipolar disorder, attention deficit disorder, and posttraumatic stress disorder, which caused him to have concentration issues and racing thoughts. [R 54-55]. He could read "something for five minutes" and then forget what he read due to his racing thoughts. [R 58]. Misener also stated he stopped attending church due to the crowds. [R 57].

*1. VE Testimony*

The ALJ then asked the VE a series of questions. First, the ALJ posited a hypothetical individual with Misener's age, education, and past work experiences, but limited to sedentary, unskilled work involving only brief superficial interactions with fellow workers, supervisors, and public, and limited to only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. [R 68]. The VE responded that such an individual could not perform Misener's past work, but could perform work as an assembler, an inspector, and information clerk. [*Id.*] The ALJ then added the need to use a cane for ambulation, and the VE responded that all three positions were still available in significant numbers in the State of Indiana. [R 69]. The VE also testified that the standards for being on-task and absenteeism are 85% to 90%, and no more than one day per month, respectively. [*Id.*]

*2. ALJ Decision*

The ALJ, John Pope, found that Misener met the insured status requirements of the Social Security Act through December 31, 2011. [R 13]. In addition, the ALJ found that Misener had not engaged in substantial gainful activity since the onset of his alleged disability. [*Id.*]. The ALJ concluded that Misener had the severe impairments of degenerative disc disease, bilateral knee pain, left ankle pain, osteoarthritis, diabetes, hypertension, depression, bipolar disorder, and posttraumatic stress disorder. [*Id.*]. He also noted moderate limitations on concentration, persistence and pace. [R 15]. But despite these impairments, the ALJ concluded that Misener did not have an impairment or combination of impairments that met or medically equaled any of those included in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. [R 14]. The ALJ found that the Claimant's allegations concerning the intensity, persistence, and limiting effects of his symptoms

were not credible. [R 17]. Moreover, the ALJ concluded that Misener had the residual functional capacity to perform sedentary work, as defined in 20 C.F.R §§ 404.1567(a) and 416.967(a), except that he could only occasionally climb, balance, stoop, kneel, crouch, and crawl; he needed to use a cane for ambulation; and he was limited to unskilled work involving only brief, superficial interactions with fellow workers, supervisors, and the public. [R 16]. Given this RFC, the ALJ subsequently concluded that Misener could not perform any of his past relevant work, but he could perform jobs that existed significant numbers in the national economy, and that he was, therefore, not disabled. [R 24].

## STANDARD OF REVIEW

The commissioner's final decision in this case is subject to review pursuant to 42 U.S.C. § 405(g), as amended, which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399-400. As a result, the court "may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Conclusions of law, unlike conclusions of fact, are not entitled to deference. If the commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## DISCUSSION

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The five step process asks:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). If the claimant is performing substantial gainful activity (step one) the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i).

If the claimant does not have a severe medically determinable impairment or a combination of impairments that is severe and meets the duration requirement (step two), then the claimant will likewise be found not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is not performing substantial gainful activity ("SGA") and does have a medically severe impairment, however, the process proceeds to step three. At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). In the alternative, if a listing is not met or equaled, then in between steps three and four the ALJ must assess the claimant's "residual functioning capacity" ("RFC"), which, in turn, is used to determine whether the claimant can perform her past work (step four) and whether the claimant can perform other work in society (step five). 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

All of Misener's arguments, in one way or another, are directed at the ALJ's RFC determination. The ALJ found that Misener has the RFC to perform "sedentary work," as defined at 20 C.F.R. § 404.1567(a),[4] with certain restrictions: (1) he may only occasionally climb, balance, stoop, kneel, crouch and crawl; (2) he must use a cane for ambulation; and (3) he is limited to

---

[4] That section provides:

(a)      Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

unskilled work involving only brief, superficial interactions with fellow workers, supervisors, and the public. Misener believes the ALJ erred in five ways while determining his RFC. His allegations are as follows:

(1) The ALJ weighed the evidence inappropriately by failing to give "controlling weight" to the statement by Dr. Kollipara, which indicated that Misener could *never* lift or carry any weight at all; could only sit for 15 minutes total in an 8-hour workday, stand for 15 minutes total in an 8-hour workday, and walk for 5 minutes total in an 8-hour workday; could only occasionally reach, handle, finger, feel, push or pull with either hand; could *never* operate foot controls with either foot; and could *never* climb stairs or ramps, climb ladders or scaffolds, balance, stoop or kneel.

(2) The ALJ weighed the evidence inappropriately by giving "great weight" to the state agency medical examinations by Drs. Lavallo and Wenzler.

(3) The ALJ improperly concluded that the side effects associated with Misener's pain medications were "mild," whereas Misener believes they are severe.

(4) The ALJ failed to account for off-task time and absenteeism when formulating the RFC.

(5) The ALJ improperly decided that certain of Misener's statements about his own symptoms were not credible.

Proceeding through Misener's arguments in order, this Court finds no error until it considers his fourth issue. Even then, the Court is not necessarily persuaded that the ALJ erred by failing to account for off-task time and absenteeism when forming the RFC. But in analyzing the issue – essentially, whether the ALJ properly accounted for the Claimant's mental limitations in formulating the RFC – it came to the Court's attention that the ALJ found moderate difficulties with concentration, persistence and pace when performing his listings analysis, but did not include those limitations in his RFC or in the hypotheticals posed to the VE. Under Seventh Circuit precedent, it is clear that the RFC must incorporate all of the Claimant's mental limitations in his RFC finding,

and as a result, the omission of such limitations does warrant remand.

A.    **Issue One: Whether the ALJ Erred by Failing to Give "Controlling Weight" to Dr. Kollipara's Statement, and by Giving it "Low Weight" Instead**

Disability cases typically involve three types of physicians: 1) a treating physician who regularly provides care to the claimant; 2) an examining physician who conducts a one-time physical exam of the claimant; and 3) a reviewing or non-examining physician who has never examined the claimant, but read the claimant's files to provide guidance to an adjudicator. *See Giles v. Astrue*, 433 Fed.Appx. 241, 246 (5th Cir. 2011). The opinion of the first type, a "treating physician," is ordinarily afforded special deference in disability proceedings. The regulations governing social security proceedings instruct claimants to that effect:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). When the treating physician's opinion is *not* entitled to controlling weight, however – such as where it is not supported by the objective medical evidence, where it is inconsistent with other substantial evidence in the record, or where it is internally inconsistent, *see Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)) – then the ALJ should move on to assessing the value of the opinion in the same way he would any other medical evidence:

> When we do not give the treating source's opinion controlling weight, we apply the

factors listed in paragraphs (c)(2)(i)[5] and (c)(2)(ii)[6] of this section, as well as the factors in paragraphs (c)(3) through (c)(6)[7] of this section in determining the weight to give the opinion.

20 C.F.R. § 404.1527(c)(2). In summary, in assessing what weight to give a treating source statement, the ALJ must proceed step-by-step. First, the ALJ asks whether the treating source

---

[5] 20 C.F.R. § 404.1527(c)(2)(i) reads:

Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

[6] 20 C.F.R. § 404.1527(c)(2)(ii) reads:

Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

[7] 20 C.F.R. §§ 404.1527(c)(3)-(6) read:

(3)     Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)     Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)     Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)     Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

statement is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record[.]" § 404.1527(c)(2). If it is, it must be given "controlling weight." If it is not, however, the ALJ must ask just how much weight to give it relative to the other record evidence, guided by the factors listed at §§ 404.1527(c)(2)(i)-(ii) and §§ 404.1527(c)(3)-(6).

     *1.      The ALJ did not err by refusing to give the statement "controlling weight."*

At the first step of the analysis, the ALJ concluded that Dr. Kollipara's opinion was not entitled to controlling weight. Among other things, the ALJ gave the following reasons for his decision: (1) the limitations indicated by Dr. Kollipara's report were far greater than, and therefore inconsistent with, other substantial record evidence, including the claimant's own testimony; (2) Dr. Kollipara's own treatment of the claimant was inconsistent with the severity of the limitations he indicated, therefore creating an internal inconsistency; and (3) Dr. Kollipara's opinion was not supported by the formal medical testing included in the record. [R 22]. There is no doubt that those reasons for refusing to afford controlling weight – internal and external inconsistencies and a lack of support in the objective medical testing – are generally acceptable ones under the applicable regulations. *See* 20 C.F.R. § 404.1527(c)(2); *Clifford*, 227 F.3d at 871. And all the ALJ was required to do, in his written determination, was "minimally articulate" his reasons for discrediting Dr. Kollipara's report. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." (internal quotations omitted)); *Skarbek v. Astrue*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating

19

physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability" (internal citations omitted)); *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The ALJ did minimally articulate his reasons for discrediting Dr. Kollipara's statement, *see Skarbek*, 390 F.3d at 503 (ALJ's simple statement that "[treating source's] opinion was not well-supported by medical evidence" satisfied minimal articulation standard), and the reasons he gave are among the acceptable reasons for doing so. As a result, the only question remaining for the Court to consider is whether the ALJ's conclusion that those reasons are present in this particular case was supported by substantial evidence, *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005), or, put another way, whether it was within the realm of reasonable conclusions in light of the record. *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

It was. In fact, it would be difficult to see how the ALJ could treat Dr. Kollipara's treating source statement as credible, let alone controlling. [R 733-738 (Dr. Kollipara's statement)]. It is hard to overstate the level of disability that Dr. Kollipara reported. For one thing, he claimed Misener could only sit for 15 minutes total in an 8-hour workday, stand for 15 minutes total in an 8-hour workday, and walk for 5 minutes total in an 8-hour workday, and could *never* climb stairs or ramps, climb ladders or scaffolds, balance, stoop or kneel. [R 734, 736]. There are only so many things a person can do with his or her body; according to Dr. Kollipara's report, it would appear that everything other than laying down, inert, is totally out of the question for Misener for *7 hours and 25 minutes* out of an 8-hour workday. No objective medical evidence exists anywhere in the entire 738-page record which supports drawing such an extreme conclusion. Objective medical evidence is present supporting the claimant's difficulty with standing and walking, to be sure, but there is

none showing why the claimant would struggle to *sit* for more than 15 minutes, total, in an 8-hour workday. To the contrary, evidence abounds that Misener is actually able to sit for longer periods of time. Dr. Yu noted that he could sit for an hour, repeatedly, between bouts of walking for about 100 feet. [R 414]. Misener himself told the ALJ he can sit for a total of an hour and fifteen minutes, total, during an 8-hour day. [R 61]. For that matter, most of his current daily routine involves sitting or otherwise being more active than Dr. Kollipara suggests for extended periods of time. [R 51 (claimant alternately sits, stands, and stretches on his porch for about an hour to an hour-and-a-half each day, which, any way you cut it, amounts to more "non-laying" activity than Dr. Kollipara thinks is possible in an eight-hour span); R 52 (claimant engages in "non-laying" activities of getting up, eating, and sitting to watch television for roughly two hours every evening, still within the same 8-hour span as his early-afternoon bout of activity)]. The Court finds a similar lack of support for some of the other more extreme limitations in Dr. Kollipara's statement, particularly that could *never* operate foot controls with either foot, and could *never* lift or carry any weight at all, even up to ten pounds. In fact, no doctor who treated Misener ever put *any* specific restrictions on his physical activities, which would seem to be a natural thing to do for a patient who must be confined to laying in bed for 7 hours and 25 minutes out of every 8 hours. [R 48]. In short, Dr. Kollipara's more extreme limitations simply are not supported by any objective medical evidence, or by any other evidence at all.

In addition to the lack of support for the extent of the limitations he listed, Dr. Kollipara's statement is internally inconsistent. For example, he writes that Misener can *never* stoop or kneel, but can occasionally crawl. [R 736]. How a person can attain a crawling posture without ever stooping or kneeling on the way down or up, even for a moment, is hard to understand. Dr.

Kollipara's statement is also inconsistent with the remainder of the evidence. In addition to the inconsistencies discussed above, Dr. Kollipara's finding that the claimant can never operate foot controls with either foot is not at all consistent with Dr. Yu's finding that Misener can operate a vehicle [R 414] and Misener's own testimony that he would have no trouble with the pedals when operating a vehicle. [R 61]. In light of the foregoing, the Court finds that the ALJ's refusal to give controlling weight to Dr. Kollipara's opinion, due to internal and external inconsistencies and a lack of support in the objective medical testing, was based on substantial evidence. *See Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (substantial evidence "must be more than a scintilla but may be less than a preponderance."). This is consistent with the case law. "An ALJ . . . may discount a treating physician's medical opinion if the opinion 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.'" *Schmidt*, 496 F.3d at 842 (quoting *Skarbek v. Barnhart*, 390 F.3d at 503).

Even if that were not the case, however, it is worth observing that the ALJ was never required to give special treatment to Dr. Kollipara's statement in the first place. The statement in question is not a treating physician's intake note, progression note, or diagnostic impression. It is an RFC assessment, plain and simple. [R 733-738]. Defense counsel has even referred to it openly as "the Residual Functional Capacity from Dr. [Kollipara]." [R 70]. Pursuant to 20 C.F.R. § 404.1527(d)(2), "Although [the Commissioner will] consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner." And, pursuant to 20 C.F.R. § 404.1527(d)(3), "[The Commissioner] *will not give any special significance to the source of an opinion* on issues reserved

to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." (emphasis added). In other words, the "treating physician rule" – which is a rule conferring special significance to the source of an opinion – does not even apply to an RFC assessment, whether the physician who completed it qualifies as "treating" or not.[8]

Thus, one way or another, there is no error in the ALJ's decision to move on to determining how much weight to give Dr. Kollipara's statement relative to the other record evidence, as guided by the factors listed at §§ 404.1527(c)(2)(i)-(ii) and §§ 404.1527(c)(3)-(6). If the statement does qualify for consideration under the "treating physician rule," it is not entitled to controlling weight due to inconsistencies and a lack of support. If it does not qualify for consideration under the rule, it defaults to being weighed like any other evidence anyway.

### 2. *The ALJ did not err by assigning the statement "low weight."*

After deciding not to give Dr. Kollipara's statement controlling weight, the ALJ was obligated to consider what weight to give to it compared to the other medical evidence. In deciding to give the assessment low weight, the ALJ cited the same problems that convinced him it was not entitled to controlling weight, and also noted that the treating relationship between Misener and Dr. Kollipara was quite brief and that Dr. Kollipara's RFC assessment was little more than a check-the-box form which contained no explanation for its conclusions. In shorthand, the factors the regulations suggest are: length of treatment and frequency of examination (§ 404.1527(c)(2)(i)); nature and extent of the treatment relationship (§ 404.1527(c)(2)(ii)); supportability (§ 404.1527(c)(3)); consistency (§ 404.1527(c)(4)); specialization (§ 404.1527(c)(5)); and other factors

---

[8] At the time the ALJ's decision was rendered, 20 C.F.R. § 404.1527 was organized differently than it is today. That has no material bearing on this issue, however. The provisions cited as subsections (d)(2) and (d)(3) were located at (e)(2) and (e)(3), but were textually identical.

(§ 404.1527(c)(6)). These are precisely the factors the ALJ considered. He found the treatment relationship was brief and only involved five visits; that the conclusions Dr. Kollipara reached were unsupported by the record; that the conclusions Dr. Kollipara reached were not consistent with other record evidence and were internally inconsistent; and that not a great deal of effort appears to have gone into completing the RFC assessment (an "other factor"). [R 22]. Some of these considerations, such as the brief nature of the relationship, are indisputable. Others, such as the lack of support and the inconsistency, are supported by substantial evidence, as this Court has already concluded. The ALJ's decision to afford Dr. Kollipara's opinion little weight was within the realm of reasonable interpretations of the record, and it was supported by the evidence. There may be other reasonable ways to decide what weight to afford to the statement, as well, but it is not this Court's job to re-weigh the evidence. *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). In conclusion, this Court finds no error in the ALJ's treatment of Dr. Kollipara's statement.

**B.    Issue Two: Whether the ALJ Erred by Giving "Great Weight" to the State Agency Assessments**

In the section of his brief dedicated to this issue, Misener attacks the ALJ for failing to adequately support his findings. [DE 16 at 20]. It is true that while the ALJ "need not address every single piece of evidence in his decision . . . his analysis must build an accurate and logical bridge between the evidence and his findings." *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) (citing *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). But the ALJ need not draw that bridge in great detail. He need only "minimally articulate his reasons for crediting or rejecting evidence of disability." *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (citing *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

The ALJ did that here. In explaining why the state agency medical consultants' assessments

were given great weight, the ALJ wrote:

> The opinions were rendered by medical experts that had the opportunity to review the evidence of record. Their opinions are consistent with the objective medical evidence of record and the [C]laimant's alleged activities of daily living. As specialists for the Social Security Administration, the [s]tate agency medical consultants are well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act, as amended.

[R 23]. The reasons given by the ALJ are facially consistent with the factors an ALJ is instructed to consider when determining how much weight to give to a medical opinion. The first reason – that the consulting examiners had the opportunity to review the medical record – goes to 20 C.F.R. § 404.1527(c)(3)("[the Commissioner] will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources") and 20 C.F.R. § 404.1527(c)(6)("the extent to which an acceptable medical source is familiar with the other information in your case record [is a] relevant factor[] that [the Commissioner] will consider in deciding the weight to give to a medical opinion"). The second reason – consistency with the objective medical evidence – goes to supportability under 20 C.F.R. § 404.1527(c)(3). The third reason – that the consulting examiners are specialists – goes to 20 C.F.R. § 404.1527(c)(5), instructing the ALJ to consider "specialization." *Id.* ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist").

Moreover, for the most part, the Claimant does not even dispute the factual accuracy of what the ALJ said. He does not dispute that the consulting examiners were medical experts, or that they had access to his medical records, for example. In fact, the only argument Misener offers against the ALJ's conclusion is a set of repeated assertions that it was wrong to emphasize the consistency between the consulting examiners' reports and the Claimaint's alleged activities of daily living,

when the information in the record about the Claimant's daily activities is subject to multiple interpretations. [DE 16 at 20-21]. This method of argument is problematic for several reasons – not the least, that it plainly asks the Court to re-weigh the evidence and decide that the way the ALJ weighed the evidence was wrong – but more than that, it is incomplete. Whether "consistency with the Claimant's alleged activities of daily living" was a valid factor or not, Misener has shown no problem with the ALJ's reliance on the consulting examiners' familiarity with his medical history or the consistency of their reports with the objective medical evidence, both of which actually track more closely with the factors listed in the regulations. The Court independently finds that those two considerations[9] were supported by substantial evidence, and by stating them explicitly in his order, the ALJ met his obligation to "minimally articulate" his rationale for affording great weight to the reports of the consulting examiners. *Scivally*, 966 F.2d at 1076.

## C.  Issue Three: Whether the ALJ Improperly Concluded that the Side Effects Associated with Misener's Pain Medications Were "Mild," when Misener Believes They Are Severe

An ALJ has no duty to make specific findings concerning the side effects of a Claimant's medication. *Labonne v. Astrue*, 341 Fed.Appx. 220, 226 (7th Cir. 2009) (noting that "an ALJ is not required to provide a complete written evaluation of each piece of evidence, including the side effects of medication" (internal citations omitted)); *Nelson v. Sec'y of Health & Human Servs.*, 770

_____

[9] The ALJ's third remaining argument – that the consulting examiners were "specialists" who were "well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act," is not particularly persuasive. The sort of specialization which the regulations contemplate is *medical* specialization, *see* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty"), but the sort of specialization the ALJ ascribes to the consulting examiners here is more of a legal, or regulatory, specialization – extensive knowledge of what it means to be "functional" under the terms of the Social Security Act, not what it means to be functional in any uniquely medical sense. Since the RFC is an issue reserved to the Commissioner, it seems odd to add weight to a medical opinion based on the author's familiarity with the RFC concept. The consulting examiners may well have been specialists in an applicable field of medicine, properly defined, but that is not reflected in the ALJ's decision. That said, since there is no problem with the other reasons cited by the ALJ for affording these opinions considerable weight, the potential issues with this one reason do not show that his opinion was not supported by substantial evidence.

F.2d 682, 685 (7th Cir. 1985) (an ALJ does not have a duty to make specific findings concerning the side effects of prescription drugs). That said, if the ALJ *does* make a finding concerning the effect of side effects, it must be supported by substantial evidence, just like any other conclusion. *Nelson*, 770 F.2d at 685. The Court is also mindful that, as a part of the process of building an analytical bridge from the evidence to a conclusion, the ALJ is always required to confront significant evidence that conflicts with his decision. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995).

In rendering his decision, the ALJ wrote:

> The [C]laimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in the [C]laimant's favor, but the medical records reveal that the medications have been relatively effective in controlling the [C]laimant's symptoms. Although the [C]laimant has alleged various side effects from the use of medications, the record indicates generally that those side effects are mild and would not interfere with the [C]laimant's ability to perform unskilled work.

The court's task is to determine whether the ALJ's conclusion that the record shows that medications were "relatively effective" and that the side effects were generally mild is supported by substantial evidence. That requires a look at the record evidence concerning Misener's medication history.

On November 1, 2005, Dr. Spight noted that Misener had prior "failures" with Aleve, Excedrin Migraine, Tylenol Migraine, Imitrex, Relpax, Darvocet, Norco, Topamax, Keppra and Stadol due to side effects. [R 316]. On November 9, 2005, Dr. Spight discontinued MS Contin and Hydrocodone due to possible side effects. [R 323]. On January 16, 2006, Dr. Spight discontinued Fentanyl after Misener reported side effects, including nausea, vomiting, sweating, and shaking to the extent that he had to visit the ER. [R 253]. On February 10, 2006, Dr. Wheeler noted that pain control through Norco was "fair," and that the Claimant was suffering from side effects related to

Duragesic. [R 255]. Every single one of these doctor visits occurred *prior* to Misener's alleged date of disability onset, and they are therefore not particularly helpful. The Court is aware that the ALJ may not simply *ignore* record evidence which predates the alleged onset date, *see Doherty v. Astrue*, No. 1:11-CV-00838, 2012 WL 4470264 (S.D. Ind. 2012), but where the evidence pertains to a temporally discrete event, such as an acute side effect related to now-discontinued medication, which does not appear to be ongoing or to have been repeated within the alleged disability period, it is easy to see how the relevance of that evidence is limited.

The record evidence from *within* the alleged disability period shows significantly less trouble with medication. On June 27, 2006, Misener reported no side effects due to Norco and Oxycontin, and that pain control was "fair," but was only lasting about 8 hours. [R 245]. His OxyContin dosage was increased. [R 247]. On July 27, 2006, Misener reported that he had "hang-over" side effects related to the OxyContin, and he stopped taking it. [R 248]. Naturally, since Misener was not taking his medication, his pain control was "poor." [R 248]. His OxyContin was discontinued and replaced by Methadone. [R 249]. On August 23, 2006, Misener reported that the Methadone was controlling his pain more effectively, but that it didn't last very long. [R 251]. On October 17, 2006, Misener reported side effects related to the Methadone, including shortness of breath and lightheadedness. [R 270]. Although his pain control was good, his dose was either upped or discontinued. [R 271; R 286].[10] On February 7, 2007, Misener's pain control was good, and his side effects were none. [R 277]. On March 1, 2007, pain control was fair and side effects were none. [R 275]. At the hearing, the Claimant testified that he has side effects of "nausea, sleeping, sleepy [*sic*], shakes, numbness"

---

[10] There is an oddity in the record, here. Dr. Fortin wrote up two separate reports for the same visit. [R 270-71; R 286-87]. In the first version, he ups Misener's methadone dose; in the second version, he discontinues Methadone due to side effects. Choosing which to believe is the province of the ALJ, not of this Court.

from his medication. [R 49]. No additional record evidence exists, however, showing particular trouble with medication from March of 2007 until the present.

The Court finds that the ALJ's characterization of Misener's trouble with side effects as generally mild and his characterization of the drugs as relatively effective are supported by substantial evidence. As already discussed, the most relevant evidence by far with respect to this question is the evidence from after the alleged date of onset, since that is the time period in which Misener must be claiming that his side effects contributed to his inability to engage in SGA. There are approximately six accounts of the efficacy and side effects of Misener's medication during that time period. In only one of those accounts did Misener describe his pain control as "poor," and it was during the time period in which he had stopped taking his medication. [R 248]. Twice, he reported his pain control was good, twice he reported it was fair, and once he described it as improved. In light of that, it was reasonable for the ALJ to consider Misener's medications "relatively effective" in treating his pain. With respect to side effects, Misener only reported them on two occasions within the relevant time period. Once, he reported OxyContin made him feel hungover. Once, he reported that Methadone made him lightheaded and short of breath. But in his two more recent accounts, he reported no side effects at all. [R 277; R 275]. Referring to the overall history, therefore, as generally mild, is not unreasonable.

The only remaining question is whether the ALJ failed to confront any significant contrary evidence. The only evidence which comes to mind is Misener's testimony at the hearing, in which he reported side effects not substantiated at any recent date in the record. But the ALJ found that Misener's testimony was not credible. Whether the credibility finding was independently supported is another issue, dealt with later in this order, but this Court is satisfied that disregarding Misener's

testimony about side effects on credibility grounds counts as "confronting" that evidence.

**D.     Issue Four: Whether the ALJ Failed to Account for Mental Limitations when Formulating the RFC**

The ALJ has final responsibility for deciding a claimant's RFC, which is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1546(c), 404.1527(e). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Further, an ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Most important in this case, "[a]n ALJ must take into account an applicant's mental limitations when determining the RFC." *Hill v. Astrue*, 295 Fed.Appx. 77, 83 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(c); *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008)). Misener's specific allegation with respect to his mental RFC is that the ALJ failed to account for off-task time or absenteeism. The Court independently notes a second problem: that the RFC failed to account for moderate limitations on concentration, persistence, and pace.

Misener is correct that the ALJ never made any determination of Misener's probable rate of off-task time or absenteeism. The government's response seems to be that we can infer from the ALJ's silence on the subject that he decided any portion of the evidence related to absenteeism or off-task time was not credible. The Court will not decide whether that is a justifiable inference to draw or not, however, because there is a more obvious error in the record. That said, the ALJ is

encouraged to use the remand as an opportunity to clarify how he accounted for off-task time and absenteeism in his RFC, as well.

During his listings analysis, the ALJ found that Misener suffers from "moderate" limitations with respect to "concentration, persistence and pace." [R 15]. But those limitations never made their way into the RFC. The RFC limits Misener to "unskilled work" involving only "brief interactions with others" [R 16], but the Social Security Administration has explained: "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85–15; *see also Craft*, 539 F.3d at 677 (quoting same). In the Seventh Circuit, at least, limiting a Claimant to "unskilled" work is not an adequate proxy for specifically acknowledging his limitations in concentration, persistence and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); *see also Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009) (limiting hypothetical to simple, routine tasks did not account for limitations of concentration, persistence and pace); *Craft*, 539 F.3d at 677–78 (restricting hypothetical to unskilled work did not consider difficulties with memory, concentration or mood swings). Neither is a limitation to only "brief interactions with others." That is a reflection of Misener's limitations with respect to social functioning, an area in which the ALJ also found moderate limitations. [R 15]. The ability to function in social settings and navigate workplace social interactions is very different from the ability to concentrate on individual work with a certain degree of success and productivity, and accounting for a limitation in the former area does not necessarily alleviate difficulties in the latter area. It is unclear, for example, how limiting the Claimant to brief interactions with others would alleviate the fact that "[h]e needs to

reread things[,]" or that he has "demonstrated poor concentration, inattentiveness, and restlessness." [R 15]. In short, to find that the Claimant has moderate limitations with respect to concentration, persistence, and pace, but to fail to include those limitations in the RFC (or, for that matter, in the hypotheticals posed to the Vocational Expert), is an error that warrants remand under *O'Connor-Spinner*.

**E.**   **Issue Five: Whether the ALJ Improperly Decided that Certain of Misener's Statements About His Own Symptoms Were Not Credible**

Since the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset so long as it finds some support in the record and is not patently wrong. *Craft*, 539 F.3d at 678. Indeed, "[o]nly if the trier of fact grounds his credibility in an observation or argument that is unreasonable or unsupported can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). However, an ALJ's credibility findings need not specify which statements were not credible. *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). The Court should give the ALJ's opinion a "commensensical reading," rather than "nitpick . . . for inconsistencies or contradictions[.]" *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The process for evaluating a social security applicant's symptoms has two major steps. First, the applicant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(a), (b). In Misener's case, the ALJ found that his medically determinable impairments could reasonably be expected to cause his alleged symptoms. [R 17].

Second, the ALJ must then evaluate the intensity, persistence, and limiting effects of the

individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 404.1529(a). While an ALJ may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the ALJ may consider that as probative of the applicant's credibility. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Further, since "applicants for disability benefits have an incentive to exaggerate their symptoms[,]" an ALJ is "free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

When assessing the credibility of the applicant's statements, the ALJ was to consider, in addition to objective medical evidence:

> (i) the individual's daily activities; (ii) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (iii) factors that precipitate and aggravate the symptoms; (iv) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or symptoms; (v) treatment other than medication the individuals receives or has received for relief of pain or other symptoms; (vi) any measures other than treatment that the individual uses to relieve pain or other symptoms; and (vii) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 96-7p. In his decision, the ALJ in this case stated the following:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

[R 17]. Rather than stop there, however, the ALJ proceeded to discuss the entire record over the next seven pages of his decision in an analysis that proceeded through each of the factors found at 20 C.F.R. § 404.1529(c). In two paragraphs [R 23, R 24], the ALJ considered the Claimant's daily activities. § 404.1529(c)(3)(i). He showed that Misener's reports concerning his daily activities were inconsistent; for example, at one point Misener said he would play with his children for an hour or

two, including play-wrestling, and at one point he said his symptoms were so severe he could only play for ten to fifteen minutes at a time. [R 23]. The ALJ also discussed at length the various characterizations of the Claimant's symptoms, and what factors aggravated them and alleviated them. § 404.1529(c)(3)(ii), (iii). He discussed the Claimant's medication history in detail and found, based on substantial objective medical evidence, that the drugs were relatively effective with mild side effects, a conclusion which this Court has already found was not in error. [R 23]. § 404.1529(c)(3)(iv). He noted that, aside from medication, the measures taken by Misener's doctors to treat his claimed pain have been relatively conservative in nature, with no surgeries and mostly a history of steroidal injections. [R 21]. § 404.1529(c)(3)(v), (vi). Finally, he also considered other factors throughout this extensive discussion, including the fact that examining physicians found Misener difficult, uncooperative, and probably dishonest. [R 20].

In short, the ALJ covered every one of the factors the Commissioner aims to consider when determining the severity of a claimant's symptoms, and he covered them at a fair level of detail. Misener's arguments against the ALJ's conclusion that he was not entirely credible are not meritorious. For example, he argues that the ALJ should not have considered the lack of movement restrictions from physicians the Claimant visited to be evidence of less severe symptoms than claimed, because "the ALJ makes a presumption here that physicians always record in their treatment notes limitations for their patients to follow rather than merely verbalize them." [DE 16 at 25]. This is simply not true. If anything, the ALJ assumed that at least *one* physician, *somewhere* along the line, might have issued a written restriction if the Claimant was so thoroughly disabled as he and Dr. Kollipara claimed – not that all physicians always record such limitations in their notes. But more importantly, the ALJ was merely making the observation that no evidence existed to

support the extreme limitations Misener claimed. A lack of support from the medical evidence, combined with inconsistencies with the evidence which does exist and which in fact shows lesser limitations, cuts against the Claimant's credibility. The Claimant's "subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

Beyond that, Misener calls the ALJ's assertion that "[t]he treatment notes indicate that the treatment has helped in controlling the [C]laimant's symptoms," [R 21], was "patently untrue." [DE 24 at 9]. However, as this Court has already discussed at length, the record *does* contain physician's notes recording that the defendant's pain control as a result of his medication was "better," "fair," or "good," for the majority of the time during the claimed period of disability. Misener is free to disagree with the way the ALJ interpreted that evidence, but that does not make it patently untrue. Misener also makes an unusual argument concerning the ALJ's consideration of the relatively conservative nature of the treatment he has received so far; Misener seems to think the ALJ found him not credible because he has not had surgery. [DE 24 at 8-9]. But in fact, the conservative nature of the treatment Misener has received was just one of seven factors, listed in the regulations, with the ALJ was required to consider in determining the severity of Misener's symptoms. The credibility finding was a result of the fact that Misener's statements about his own symptoms conflicted with the holistic picture of his medical condition that consideration of those seven factors produced, not to mention the fact that his statements often conflicted with each other. It was not a reflexive reaction to the fact that he had never had back surgery.

Reviewing the ALJ's decision, this Court concludes that the ALJ adequately considered the evidence in the record in making his credibility determination. While "the ALJ's adverse credibility

finding was not perfect", it was "also not patently wrong." *Shideler*, 688 F.3d at 312. The ALJ went beyond mere template language and "explained his conclusion adequately[,]" in fact going into great detail. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). He provided a "glimpse into the reasoning" behind his decision by showing how Misener's account of the severity of his symptoms was inconsistent with objective medical evidence, with his alleged activities of daily living, and with his treatment history to date, and by noting the impressions of doctors who examined Misener that he was not entirely forthcoming. The ALJ was justified in finding these considerations to be probative of Misener's credibility. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). By examining the case record and articulating specific reasons for his conclusion, the ALJ rendered a sufficient credibility assessment. *Simila*, 573 F.3d at 517.

## CONCLUSION

Because the ALJ found that Misener suffers from moderate limitations in concentration, persistence and pace, but failed to incorporate those limitations into the RFC or the hypotheticals posed to the Vocational Expert, the decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings.

SO ORDERED.

ENTERED:   February 20, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court